**In re James Bronce HENDERSON, III, Debtor.**

**No. 02–16887–9P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

July 17, 2003.

Louis X. Amato, Louis X. Amato, P.A., Naples, FL, John D. Emmanuel, Fowler

White Boggs Banker, P.A., Hywel Leonard, Carlton Fields, Tampa, FL, Timothy A. Fusco, Troy, MI, Michael C. Hammer, Detroit, MI, Mark Shapiro, Southfield, MI, Arthur J. Spector, Berger Singerman, Fort Lauderdale, FL, for Creditors.

Lynn V. Cravey, Asher Rabinowitz, Ruden, McClosky, Smith et al., St. Petersburg, FL, Christopher A. Grosman, for Debtor.

T. Patrick Tinker, Office of the U.S. Trustee, Tampa, FL, for U.S. Trustee.

### *AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION*

ALEXANDER L. PASKAY, Chief Judge.

This is a yet to be confirmed Chapter 11 case of James Bronce Henderson, III (Debtor). In the Debtor's Chapter 11 case, 6700 Development Associates, L.L.C. (6700) filed a proof of claim, Claim No. 70, in the total amount of $6,751,987.27. (Claim No. 70/6700 Ex. 1). The Claim, as more fully described below, is based on a personal guaranty by the Debtor of a commercial lease entitled "Lease" (DCT Lease) between 6700, as the lessor and DCT, Inc. (DCT), as the lessee and at that time the Debtor was the President of DCT. On December 24, 2002, the Debtor filed an Objection to two separate claims entitled "Debtor's Objection to Claim Filed by Van Buren Industrial Investors, L.L.C. and Claim Filed by 6700 Development Associates, L.L.C." (Doc. No. 81). This Memorandum Opinion deals only with the Objection to the claim of 6700.

The claim of 6700 is filed as an unsecured claim and is composed of three distinct components. First, is a claim for real estate commissions in the amount of $326,812.50, paid to Kojaian Management Company (Kojaian), for re-leasing the DCT premises to Visteon Corp. (Visteon), an entity that had previously sublet part of the premises from DCT. Second, is a claim for legal expenses incurred by 6700, in the amount of $15,675.29, in connection with its suit filed in Detroit, Michigan against the Debtor on his personal guaranty of the DCT Lease. This suit was tried before the commencement of this Chapter 11 case and the state court granted a partial summary judgment in favor of 6700 and against the Debtor determining liability. (6700 Ex. 6). However, before the damage phase of the suit could be tried, the commencement of this Chapter 11 case stopped all further proceedings in Detroit. The third is a claim of 6700 for the unpaid rent under the DCT Lease when the Visteon Lease, as more fully described below terminates. This amount has been reduced to its present value for the period from January 1, 2007 up to and including May of 2009, which is in the amount of $6,409,499.48.

The Objection of the Debtor to the allowance of the claim of 6700 is based on the following contentions: (1) The real estate commission was paid to an insider, Kojaian and the Visteon Lease has no provision for payment of a real estate commission. (2) The legal fees claimed by 6700 are not covered by the guaranty and are therefore not recoverable. (3) There is no rent due whatsoever for the rent not received but accrued under the DCT Lease after the Visteon Lease is terminated, until the expiration of the DCT Lease, which is in the year 2009. The Debtor does concede that the Visteon Lease provides for only a five-year term, which is less than what remained under the DCT Lease. However, the Debtor contends that Visteon has two five-year options and due to the nature of the business and its operation, Visteon will exercise both options and will not vacate the premises at

the end of the initial term of its lease with 6700, in the year 2007.(4) Finally, the Debtor alleges that 6700's claim against him, as guarantor, should be restricted by the "cap" imposed by 11 U.S.C. § 502(b)(6).

At the trial, this Court heard testimony of witnesses, considered the documents offered and introduced into evidence, and now makes the following findings of fact and conclusions of law.

The Debtor obtained an undergraduate degree in metallurgical engineering and a Master's Degree in Business Administration. Upon graduation in 1973, the Debtor worked in quality engineering, manufacturing engineering, and marketing. In 1980, the Debtor moved back to Detroit and joined his father at DCT.

In 1966, the Debtor's father formed DCT. DCT operated as a machine shop, fabricating parts details for the automotive industry and for machine tool companies for the automotive industry. Soon after joining the company in 1980, the Debtor became its President and operated DCT until February 14, 2002. On that date, some of DCT's creditors filed an involuntary Chapter 7 bankruptcy petition against DCT, which was shortly thereafter followed by the entry of an Order for Relief.

This ironic turn of events was surprising, especially since under the Debtor's stewardship, between 1980 and 2000, DCT grew from 22 employees to more than 1000. At its peak in 2000, DCT's gross sales topped $200 million dollars and the company became one of North America's largest robotics integration companies. The Debtor, in addition to running DCT, also established two companies that owned real estate: James Bronce Henderson Real Estate Limited Partnership and Henderson Properties L.L.C. These companies leased to DCT and to one other company property for the various companies' needs. Ninety to ninety-five percent of the industrial real estate space under the DCT Lease was used for automotive manufacturing purposes and the balance was utilized for offices within the industrial space.

From time to time, DCT operated out of more than one location. In fact, at the time of the involuntary bankruptcy, DCT occupied five significant facilities, with a total of about one million square feet. The majority of DCT's customer base was its business with Daimler–Chrysler, General Motors, Ford Motor Company, and so-called "tier-one" manufacturers, who sell directly to the automotive companies. Actually, approximately fifty percent of DCT's sales, toward the end of its business, were conducted with tier-one companies. In fact, Visteon, which plays a major role in the present controversy, is the second largest tier-one company in the world. DCT sold to original equipment manufacturers, known in the industry as OEM's, capital equipment that actually assembled automobiles or machine components for an automobile.

The DCT Lease, as defined above was executed by DCT, as tenant and 6700 as landlord on May 28, 1999, for a term often years, terminating on May 28, 2009 (Db.Ex. 1). The terms of the DCT Lease indicate that the basic rental rate from May 28, 1999 through May 27, 2004 was $2,250,000.00 per annum or $187,500.00 per month and increased from May 28, 2004 through May 28, 2009 to $2,470,000.00 per annum or $206,250.00 per month. *See* Section 1(g) of DCT Lease. Section 20 of the DCT Lease, entitled "Events of Default" provides that if 6700 has no right in the case of a bankruptcy of DCT to terminate the lease and DCT wants to assume or assign the lease, all defaults must be cured and adequate assurance must be made of all future performance.

The Debtor signed the DCT Lease on behalf of DCT and also as guarantor of the DCT Lease, thereby guaranteeing the performance of DCT pursuant to the guarantee clause, Section 34 of the DCT Lease.

Pursuant to the DCT Lease, DCT leased a 365,430 square foot building located at 6700 18½ Mile Road, Sterling Heights, Michigan. The leased space is roughly seven football fields in size, with 30–foot ceilings. Approximately seventy percent of the space has cranes and under the terms of the lease, DCT agreed to construct a new 60,000 square foot crane. *See* Section 1(d) of DCT Lease.

The record reflects that in September of 2001, DCT subleased approximately 115,000 square feet of the total 365,430 square feet to Visteon. (Db.Ex. 12). Visteon used this space to manufacture a high-axle system. It is without dispute that DCT paid rent to 6700 pursuant to the DCT Lease until the involuntary filing of DCT in February of 2002.

Following the filing of the Chapter 7 case of DCT, DCT rejected the DCT Lease, effective April 21, 2002. Almost immediately following the rejection of the DCT Lease, on May 7, 2002, Visteon and 6700 entered into a lease, entitled "Lease" (defined throughout this Memorandum Opinion as Visteon Lease), for the entire premises, which is the 365,430 square foot building. (Db.Ex. 2). By its terms, the Visteon Lease will expire on December 31, 2006. *See* Section 1(f) of Visteon Lease. Section 3.3 of the Visteon Lease provides that Visteon has the option to extend the initial term of the lease for two additional periods of five years each, provided however that Visteon is not in default at the time. The basic rental rate from the commencement date through May 31, 2004 is $2,250,000 per annum or $187,500 per month, and from June 1, 2004, through December 31, 2006 is $2,470,000 per an-

num or $206,250 per month. *See* Section 1(g) of the Visteon Lease. This rental rate is the same rental rate previously paid by DCT under the DCT Lease.

At trial, each party asserted the following arguments regarding the three components of 6700's claim. (1) 6700 contends that the real estate commission in the amount of $326,812.50 paid to Kojaian was for the purpose of leasing to Visteon the premises pursuant to the Visteon Lease. The Debtor objects to this component because he asserts that there is no provision in the Visteon Lease for real estate commission. In opposition, 6700 argues that when DCT sublet the property to Visteon, Visteon sublet only one-third of the property. The Visteon Lease encompasses the entire building. The Debtor is not a party to the Visteon Lease. 6700 notes that both parties to the Visteon Lease, that is 6700 and Visteon, have given the same explanation about the purpose of Section 39.7 of the Visteon Lease.

Section 39.7 of the Visteon Lease states in relevant part that "Each party represents that it has dealt with no broker or brokers in connection with the negotiation, execution, execution and delivery of this Lease, except for CB Richard Ellis. . . ." 6700 urges that this section was added to make plain that neither party had any responsibility to the other side's broker for a commission. It is the contention of 6700 that it paid Kojaian for the landlord's broker's fee while the tenant's broker's fee was waived. Moreover, the typical fee in a real estate transaction such as the new lease from 6700 to Visteon is six percent, but in this case, the tenant's broker fee was waived so three percent of the value of the lease was invoiced and paid by 6700.

6700 further contends that it is a legal entity that does not have any employees. It contracts, by written agreement or oral agreement, for all of its services, including

the service of a real estate broker, which was filled by Kojaian. Simply leasing the premises to Visteon on the same financial terms as the DCT Lease did not make 6700 whole. Rather, 6700 contends it cost them $326,812.50 to accomplish that state of affairs.

(2) Concerning the claim for legal expenses in the amount of $15,765.29 incurred in the prosecution of the state court action in Michigan by 6700 against the Debtor, 6700 concedes that the DCT Lease and guarantee do not specify that legal fees can be recovered.

(3) Regarding the "unpaid rent" component of 6700's claim, that is the tail end of the DCT Lease between January 1, 2007 through May of 2009, 6700 contends that Visteon has repeatedly refused to consider a longer lease with Visteon due to the uncertainty of their business. Mr. Kojaian contends that his firm continues to contact the head of real estate for Visteon every two to three weeks in an effort to extend the terms of the Visteon Lease, but to date, Visteon has expressed no interest in doing so.

In fact, in the deposition of Mike Collins, the real estate representative for Visteon, he confirmed both that it was possible for Visteon to relocate without much cost and that there are other manufacturers with the capability of producing the gear made by Visteon to Ford Motor Company. Collins said, "they (Visteon) could make the transition without any cost if they've got the equipment' and that 'in this market' there are other manufacturers with the idle equipment capable of making the gear made by Visteon for Ford Motor Company." (Doc. No. 210, p. 43) Collins also said that it would be feasible to move Visteon's own equipment to another location and that it has done so in the past. (Doc. No. 210, p. 45–47). In addition, Collins testified that Visteon has in the past leased a building for five years and then moved. (Doc. No. 210, p. 49–50). In opposition, the Debtor showed only speculative evidence that Visteon might decide to remain in the premises after December 31, 2006.

It is beyond peradventure that facially the Visteon Lease is for almost five-years, actually it is for four and a half years. While Visteon has two five-year options, it has no legal obligation to exercise any of the options. It is clearly the burden of the Debtor to establish with a preponderance of the evidence that based on the special nature of the business of Visteon, it will not vacate the premises at the end of the initial five-year term but will exercise at least one of its five-year options. This Court is not oblivious of the possibility based on the evidence that Visteon might renew its lease with 6700 at the end of the initial term. It is well established that if the evidence in support of an in opposition to the issue is in equilibrium the proponent of the issue has the burden. In the present instance, the mere possibility is far to short from the quality of proof necessary to overcome the conclusion that this possibility will, in fact, be translated into reality. Therefore, the Debtor failed to carry its burden. This being the case, this Court is satisfied that 6700 is entitled to assert the claim as part of its rejection damage reduced to its present value the amount it would have earned had DCT performed under the DCT Lease according to its terms.

This conclusion leads to the final contention of the Debtor, that in the event this Court awards rejection damages to 6700, the amount cannot exceed the statutory cap imposed on rejection damages pursuant to 11 U.S.C. § 502(b)(6)(A). At the conclusion of the trial, this Court directed the Debtor to file a renewed motion for summary judgment with respect to this issue. The Debtor has filed such motion,

and by separate order of this Court, this Court shall decide whether or not the cap is applicable.

Accordingly it is

ORDERED, ADJUDGED AND DECREED that Debtor's Objection to Claim Filed by Van Buren Industrial Investors, L.L.C. and Claim Filed by 6700 Development Associates, L.L.C. be, and the same is hereby, sustained in part and overruled in part. It is further

ORDERED, ADJUDGED AND DECREED that Proof of Claim No. 70 of 6700 Development Associates, L.L.C., be and the same is hereby, allowed in the amount filed, less the claim for legal expenses and real estate commissions. However, the claim is allowed for the unpaid rent, discounted to present value, subject to further order of this Court regarding the limitation imposed by Section 502(b)(6) of the Code.